1 | ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

2

MARTHA BOERSCH (CABN 126569)
3 | Chief, Criminal Division

4 | CHRISTIAAN H. HIGHSMITH (CABN 296282)
KEVIN YEH (CABN 314079)
5 | Assistant United States Attorney

6 |     450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
7 |     (415) 436-7063
    kevin.yeh@usdoj.gov

8

Attorneys for United States of America

9

10 | UNITED STATES DISTRICT COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

12 | SAN FRANCISCO DIVISION

13

UNITED STATES OF AMERICA,           )  CASE NO. 3:23-CR-225 JD
14                                   )
   v.                              )  **UNITED STATES' SENTENCING**
15                                   )  **MEMORANDUM**
GREGORY FINKELSON,                   )
16                                   )  Hearing Date: September 9, 2024
   Defendant.                      )  Time:         10:30 a.m.
17                                   )  Courtroom:    No. 11, 19th Floor
                                     )  Judge:        Hon. James Donato
18                                   )
                                     )
19 ──────────────────────────────────

U.S.' SENTENCING MEM.                I
CASE NO. 3:23-CR-225 JD

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

DISCUSSION .................................................................................................................................1

I.     Factual History..................................................................................................................1

      A.     The Section 8 Voucher Program. ..........................................................................1

      B.     Finkelson Uses a Straw Buyer to Purchase His Residence....................................2

      C.     Finkelson Wrongfully Receives Section 8 Benefits by Reporting False Information. ..............................................................................................................2

      D.     Finkelson Appropriated Section 8 Funds for His Own Benefit. ...........................3

II.     Procedural History ............................................................................................................4

III.     Sentencing Guidelines Calculation ...................................................................................4

IV.     Applicable Law .................................................................................................................5

V.     Recommended Sentence and Section 3553(a) Factors .....................................................5

      A.     Probation's Recommendation. ...............................................................................5

      B.     Government's Recommended Term of Imprisonment.. .........................................5

      C.     A Term of Imprisonment Is Appropriate Notwithstanding Finkelson's Familial and Personal Circumstances... ................................................................6

            1.     Finkelson has not shown that he is an irreplaceable caregiver for his mother... ..........................................................................................................7

            2.     Finkelson has not shown that his health issues are extraordinary or that the Bureau of Prisons is unable to provide him with necessary treatment... .................................................................................................11

CONCLUSION..............................................................................................................................12

# TABLE OF AUTHORITIES

## Federal Cases

*Gall v. United States*, 552 U.S. 38 (2007) .................................................................... 10
*United States v. Allen*, 87 F.3d 1224 (11th Cir. 1996) ............................................... 7, 8
*United States v. Brooks*, 800 F. App'x 73 (3d Cir. 2020) ............................................ 11
*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ................................................... 5
*United States v. Darji*, 609 F. App'x 320 (6th Cir. 2015) ........................................... 11
*United States v. Gutierrez*, No. 10-CR-3383 WJ, 2013 WL 12329917 (D.N.M. Aug. 23, 2013) ... 8, 9, 10
*United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) ............................................ 10
*United States v. Leon*, 341 F.3d 928 (9th Cir. 2003) ............................................. 7, 10
*United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) .................................. 10
*United States v. Piper*, No. 20-1867, 2021 WL 5088709 (6th Cir. Nov. 2, 2021) ...... 11
*United States v. Robles*, 331 F. Supp. 2d 218 (S.D.N.Y. 2004) ................................ 8, 9
*United States v. Sweeting*, 213 F.3d 95 (3d Cir. 2000) ....................................... 7, 9, 10

## Statutes

18 U.S.C. § 371 ............................................................................................................... 4
18 U.S.C. § 641 ............................................................................................................ 1, 4
18 U.S.C. § 1001 ............................................................................................................. 4
18 U.S.C. § 1028A ........................................................................................................... 4
18 U.S.C. § 1956 ............................................................................................................. 4
18 U.S.C. § 1341 ............................................................................................................. 4
18 U.S.C. § 1343 ............................................................................................................. 4
18 U.S.C. § 3553 ........................................................................................... 1, 5, 6, 10, 12

## United States Sentencing Guidelines

U.S.S.G. § 2B1.1 ............................................................................................................. 4
U.S.S.G. § 4C1.1 ............................................................................................................. 4
U.S.S.G. § 5H1.6 ............................................................................................................. 7
U.S.S.G. § 5K2.0 ............................................................................................................. 7

**INTRODUCTION**

For nearly two decades, Gregory Finkelson—the president and owner of a company named American Corporate Services (ACS), with millions in gross revenue—stole money intended to provide housing for low-income families, appropriating it for himself for such uses as a Hawaiian timeshare and investing in his own company.  He did this by repeatedly lying about his income and concealing the fact that he actually owned the million-dollar home that he purported to rent.  His conduct not only squandered resources meant for the needy, but also damaged the trust that the public must have in government in order for government to effectively serve the people.

Pursuant to a plea agreement, Finkelson has pleaded guilty to Count 2 of the Indictment charging him with Theft of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 641 & 2.  The parties and Probation agree that Finkelson's offense level is 13 and his criminal history category is I, resulting in a Guidelines range of 12–18 months.

For the reasons herein, and considering the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends that the Court order that Finkelson be sentenced to a term of imprisonment of **12 months** and 3 years of supervised release, and that he pay restitution of $341,455 and a special assessment of $100.

**DISCUSSION**

**I.     Factual History**

The PSR correctly details Finkelson's offense conduct.  The government provides the following summary to aid the Court.

**A.     The Section 8 Voucher Program.**

The Section 8 Housing Choice Voucher Program—funded by the U.S. Department of Housing and Urban Development (HUD)—helps low-income families afford decent, safe, and sanitary housing in the private market.  Voucher recipients can find housing on the private market so long as it meets certain requirements, and the program pays the difference between the actual rent charged by the landlord and the amount the tenant can pay based on income and other factors. Participants' income cannot be higher than 80 percent of the area's median income, nor can they have any ownership interest in the subsidized

unit. Voucher recipients must accurately report their income to program administrators to obtain and maintain eligibility. In San Francisco, the Voucher Program is administered for HUD by the San Francisco Housing Authority (SFHA).

### B. Finkelson Uses a Straw Buyer to Purchase His Residence.

Beginning in 2004, Finkelson conspired with a Russian national living in Russia—T.S.—to purchase a house for him and to disguise that fact so that he could receive HUD subsidies. On August 23, 2004, T.S. signed a document at the U.S. Embassy in Moscow assigning Finkelson general power-of-attorney over her assets in the United States even though she has not been in the United States since 1995. A month later, on September 14, T.S. signed another document at the embassy giving Finkelson special power-of-attorney to purchase 2076 16th Avenue, San Francisco, CA—a single-family residence.

On June 21, 2005, 2076 16th Avenue was sold via grant deed naming T.S. as the new owner when in fact the true owner was Finkelson. Finkelson and his family moved in on August 1, 2005. Finkelson then subdivided the house into three units: Unit A, where Finkelson operated ACS; Unit B, where Finkelson and his family lived; and Unit C, which Finkelson rented out.[1] Rental income from all three units, including Section 8 subsidies, flowed into bank accounts controlled by Finkelson.

### C. Finkelson Wrongfully Receives Section 8 Benefits by Reporting False Information.

On April 7, 2005, Finkelson was formally accepted into the Section 8 program in San Francisco based on his claim that he was poor and struggling financially. That same month, he filed for bankruptcy and claimed to have only $2,300 in assets even as he negotiated the purchase of 2076 16th Avenue for $1.3 million.

To maintain his Section 8 benefits, Finkelson falsely underreported his income, employment status, and his ownership of ACS. From 2015 to 2017, he reported that he earned $12,000 per year as a notary public for ACS even though he was its owner and president. According to IRS records, ACS had gross earnings of approximately $2.8 million between 2013 and 2018.

On May 16, 2007, T.S. signed a new special power-of-attorney giving Finkelson control over her

---

[1] Section 8 recipients are generally prohibited from operating a business out of, or renting out portions of, a subsidized unit.

U.S.' SENTENCING MEM.  2
CASE NO. 3:23-CR-225 JD

assets. Finkelson then created the "2008 STVKA Trust" to own and control 2076 16th Avenue, purportedly for T.S.'s benefit. On August 28, 2008, Finkelson took legal control of 2076 16th Avenue when he executed a trust transfer feed granting him formal control over the property as trustee of the "2008 STVKA Trust."

On June 1, 2011, SFHA notified Finkelson that it intended to terminate his housing assistance because he had "[f]ailed to provide true and complete information" and owned or had "an ownership interest in the subsidized unit." On August 1, 2011, Finkelson responded in a signed letter to the SFHA that he did not have an ownership interest in the property. He attached the June 21, 2005 grant deed listing T.S. as the grantee, as well as a letter from an attorney stating that Finkelson was not the owner of the property and had no ownership interest, and that the property was owned by T.S., on whose behalf he managed the property. But Finkelson never disclosed to SFHA that he had both general and special power-of-attorney over T.S.'s assets, bank accounts, and 2076 16th Avenue.

Finkelson's claim that he was not the owner of his residence was belied by his actions. Four days after he moved into the residence, he received an architectural inspection report which noted that it was "Requested by Owner Gregory Finkelson." In 2017, he told a confidential witness that he purchased 2076 16th Avenue for $1.3 million.

With regard to his income and employment, Finkelson reported to SFHA that he was "on payroll" and worked as a "manager" for ACS, earning only $1,000 per month. He also told an SFHA inspector that his boss was Boris Fudym. However, when confronted with inconsistencies during an SFHA inspection, he admitted that he owned ACS and was self-employed. Furthermore, on documents he submitted to banks to open accounts, he listed himself as ACS's president.

**D.    Finkelson Appropriated Section 8 Funds for His Own Benefit.**

Over the span of years, Finkelson opened several bank accounts in T.S.'s name, in both his and T.S.'s names, and in the name of the 2008 STVKA Trust to deposit and direct the Section 8 funds he received. On November 3, 2017, Finkelson forged T.S.'s signature on a letter sent to SFHA requesting that all future Section 8 payments be sent to a particular Wells Fargo account he controlled. Finkelson then spent the Section 8 funds for his own benefit, including transferring money to ACS and for payments towards a timeshare in Maui in Finkelson's name. Finkelson also used Section 8 funds to pay

for personal living expenses, a $2,700 necklace, a $4,825 engagement set, and personal credit card bills.

In sum, from August 2006 to February 2020, Finkelson knowingly misappropriated $341,455 in Section 8 funds by masking his ownership of 2076 16th Avenue, falsely underreporting his income, and lying about his employment and ownership of ACS.

Finkelson's residence is currently worth $2.4 million.

## II. Procedural History

On March 18, 2019, the government charged Finkelson by complaint with violating 18 U.S.C. § 641 (government theft); 18 U.S.C. § 1001 (false statement); 18 U.S.C. §§ 1341 & 1343 (mail and wire fraud); 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering); and 18 U.S.C. § 1028A (aggravated identity theft). Dkt. No. 1.

On March 21, 2019, Finkelson was arrested and released on bond. Dkt. No. 4.

On July 25, 2023, a grand jury returned an indictment charging Finkelson with the following: Count One charges a violation of 18 U.S.C. § 371 (conspiracy); Count Two charges a violation of 18 U.S.C. §§ 641 & 2 (theft of government property; aiding and abetting); and Counts Three through Five charges violations of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (money laundering and aiding and abetting money laundering). Dkt. No. 80.

On October 23, 2023, the Court set a trial date of May 28, 2024. Dkt. No. 96.

On May 7, 2024, Finkelson pleaded guilty to Count 2 of the Indictment pursuant to a plea agreement. Dkt. Nos. 105, 106.

Sentencing before this Court is set for September 9, 2024.

## III. Sentencing Guidelines Calculation

The parties and Probation agree that the Guidelines calculation is as follows:

| | | |
|---|---|---:|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(2): | 6 |
| b. | Specific Offense Characteristic, § 2B1.1(b)(1)(G) – Loss of $341,455: | +12 |
| c. | Acceptance of Responsibility: | -3 |
| d. | Zero-Point Offender Adjustment, § 4C1.1 | -2 |
| e. | Adjusted Offense Level: | **13** |

The parties and Probation agree that Finkelson's criminal history category is I. Offense Level 13 at CHC I yields a Guidelines range of **12 to 18 months**.

### IV. Applicable Law

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should first calculate the correct sentencing range under the Sentencing Guidelines. *See id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *See id.* at 991–93.

In arriving at the appropriate sentence, and in light of 18 U.S.C. § 3553(a), the Court should consider these factors applicable to this case, among others:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;
>
> (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (5) the need to provide restitution to any victims of the offense.

### V. Recommended Sentence and Section 3553(a) Factors

#### A. Probation's Recommendation.

Probation recommends that Finkelson be sentenced to a term of imprisonment of 8 months and 3 years of supervised release, and that he be ordered to pay $341,455 in restitution and a $100 special assessment.

#### B. Government's Recommended Term of Imprisonment.

The government respectfully submits that a sentence of **12 months** is sufficient, but not greater than necessary, to vindicate the considerations behind Section 3553(a). Here, such a sentence appropriately balances the Section 3553(a) factors, recognizing the seriousness of the offense, to

promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence, as well as taking into account the history and characteristics of the defendant, as described in the Presentence Investigation Report.

Unlike many defendants, Finkelson did not steal out of necessity, but apparently out of greed. He stole to maintain a lifestyle, one that involved a million-dollar home, attending the opera, thousand-dollar jewelry, and a vacation home. Finkelson is an educated man, and his business appeared to be a successful one, grossing $2.8 million between 2013 and 2018. He could have paid for his desired lifestyle through honest means if he wanted to do so. Instead, he stole to do so.

Worse, he stole from the public fisc and, in particular, money intended to help low-income families who need *any* residence, to say nothing of a million-dollar one. Finkelson's actions damage the trust that the public must have that the government safeguards taxpayer dollars and serves as a fiduciary for all. His offense is precisely the kind that breeds cynicism in government and creates the perception that the haves will always have the upper hand over the have-nots.

The government believes that a term of imprisonment of **12 months** is necessary to deter Finkelson from ever again engaging in such misconduct—here, a long-running offense that he could have ceased at any time, including in 2011 when SFHA acted to terminate his Section 8 subsidies that he had already wrongfully received for nearly six years, but he doubled down and continued stealing for another nine years—and to deter others who may act similarly. A carceral sentence is also necessary to reflect the seriousness of the crime, which, as noted, was not merely stealing money from an individual or a company, but from the government, thereby damaging the sacred trust that the public places in its civic institutions. The seriousness of the crime is augmented by the fact that the funds that Finkelson stole could have gone to another family—or multiple families—actually in need.

That said, a term of imprisonment greater than 12 months is unwarranted given Finkelson's lack of convictions, his age and health, and the fact that Finkelson has agreed to pay in restitution the full amount that he misappropriated.

### C. A Term of Imprisonment Is Appropriate Notwithstanding Finkelson's Familial and Personal Circumstances.

Finkelson argues for a two-level downward departure due to the need to care for his 88-year-old

mother (who lives in San Francisco) and his own health issues. He also asks for home confinement. The Court should reject both requests.

### 1. Finkelson has not shown that he is an irreplaceable caregiver for his mother.

Section 5K2.0(a) of the Sentencing Guidelines provides that a court may impose a sentence outside the applicable Guidelines range if the court finds "that there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that . . . should result in a sentence different than that described." Section 5H1.6, in turn, provides that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." That said, "[p]ermissible downward departures generally involve situations where the defendant is an *irreplaceable* caretaker of children, elderly, and/or seriously ill family members, and the extent of the departure appropriately serves to protect those family members from the impacts of the defendant's prolonged incarceration." *United States v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003) (original emphasis). "Conversely, downward departures that are reversed on appeal for being unwarranted often involve a non-essential caretaker." *Id.* at 932.

Courts routinely reject requests for downward departures based on the need to care for even very ill relatives where the caregiver is not irreplaceable. In *United States v. Sweeting*, the Third Circuit was "unpersuaded" that "responsibility for the care of a sick family member may constitute an extraordinary circumstance warranting a departure." 213 F.3d 95, 104 (3d Cir. 2000). There, the court reversed the district court's downward departure premised on the defendant's being solely responsible for the care of her five children, one of whom had Tourette's Syndrome. It observed that the fact that incarcerating a defendant will disrupt a family unit is, unfortunately, not atypical or extraordinary. *Id.* at 102. And with regard to the child with Tourette's Syndrome, the court stated that "there simply is nothing about the type of care that he requires that suggests to us that it is so unique or burdensome that another responsible adult could not provide the necessary supervision and assistance in [the defendant's] absence." *United States v. Sweeting*, 213 F.3d 95, 105 (3d Cir. 2000). In *United States v. Allen*—a bank fraud case in which the defendant stole $138,000, had a Guidelines range of 12–18 months (like Finkelson), and claimed that she was the primary caretaker of her seventy-year-old father, who suffered

from both Alzheimer's and Parkinson's diseases—the Eleventh Circuit held that the defendant's "family responsibilities, though difficult, are not extraordinary." 87 F.3d 1224, 1225 (11th Cir. 1996). Similarly, in *United States v. Robles*, the district court rejected a request for a downward departure because the defendant was the primary caregiver for his father, who "has had two open heart surgeries, wears a pacemaker, and suffers from seizures," because such circumstances, "while undoubtedly difficult, are not so extraordinary when compared to the hardships faced by the elderly parents of any federal incarcerated defendant who is thereby unable to provide financial and emotional support." *United States v. Robles*, 331 F. Supp. 2d 218, 220 (S.D.N.Y. 2004). And in *United States v. Gutierrez*, the district court rejected a request for a downward departure where the defendant cared for (1) a wife who suffers from a number of autoimmune diseases aggravated by activity and stress; (2) a son with autism and obsessive compulsive disorder symptoms; and (3) a mother who was 93 and had dementia because "the fact that a defendant cares for a family member with a mental or physical disability is not by itself sufficient to make the circumstances exceptional" and "Defendant has not shown that he is irreplaceable, or that the services he provides are so specialized that no one else could perform them." No. 10-CR-3383 WJ, 2013 WL 12329917, at *2 (D.N.M. Aug. 23, 2013) (internal punctuation and citation omitted).

      Here, the government does not dispute that Finkelson's mother experiences significant difficulties, and it wishes her well. But Finkelson has not shown that he is an irreplaceable caregiver or that the need to care for his mother is an extraordinary circumstance. Her conditions are not unlike those suffered by many elderly individuals, and Finkelson's need to care for her is also not unlike the responsibilities that many adults bear for their parents' well-being.

      While Finkelson argues that imprisonment would create immense difficulty for his mother, that appears to be belied by what he reported to Probation:

> Finkelson stated he and his family have discussed and prepared for the possibility of his incarceration. Finkelson's family has arranged for ongoing communication with his attorney to ensure he has proper representation and that his rights are protected throughout the legal process. They have set up a financial plan to manage household expenses and financial obligations should he be incarcerated, *as well as discussed and arranged household management, continuity of healthcare, and emotional and psychological support*.

U.S.' SENTENCING MEM.          8
CASE NO. 3:23-CR-225 JD

PSR ¶ 59 (emphasis added).  Presumably, such arrangements include ones for his mother.  The fact that arrangements have been made in anticipation of his incarceration undermines Finkelson's claims of being essential for his mother's well-being.  *See United States v. Sweeting*, 213 F.3d 95, 107–08 (3d Cir. 2000) ("Sweeting's counsel represented at the sentencing hearing that Sweeting made arrangements with friends 'who she could trust' to take care of her children . . . in the event that the district court rejected her downward departure request and sentenced her to a period of incarceration. . . . This fact further confirms that in Sweeting's absence, her son would not be left without anyone to care for him . . . .").

It also appears that Finkelson's mother has other potential sources of support.  One of Finkelson's sons, David, is 28 years old and lives nearby in Brisbane, CA.  PSR ¶ 60.  David also has "[n]ative" fluency in Russian, permitting him to communicate with his monolingual grandmother.[2]  Finkelson other son, Mark (aged 35 and married with two children), is "an accomplished individual with a strong sense of responsibility" and is "incredibly supportive."  *Id.* ¶ 61.  Though Mark lives in Russia, there is no indication that he could not share responsibility or make arrangements for his grandmother's care.  *See Robles*, 331 F. Supp. 2d at 221 ("While Robles's brother states that he is employed full time and cannot provide day-to-day care for their father, there is nothing to suggest that Robles's brother cannot make alternative arrangements to replace the care that Robles currently provides.").  Furthermore, Finkelson has a partner of 15 years, Maria Reznikova, who is "incredibly supportive."  *Id.* ¶ 57.  Thus, she appears to be another potential source of care for his mother.  *See Gutierrez*, 2013 WL 12329917, at *2 ("Defendant has not shown that his wife has no family or friends who could assist [Defendant's 93-year-old mother with dementia] if necessary.").

Furthermore, the fact that Finkelson's mother lives in her own apartment over four miles away from Finkelson (according to Google Maps)—even though Finkelson rents out a unit in his own residence, and also does not appear to have any other cohabitants in his own unit (except perhaps his partner)—suggests that she is able to live with some degree of independence and that Finkelson does not believe that her condition is so dire that he must be with her at all times.  In *Gutierrez*, the court rejected a request for a downward departure based in part on the defendant's alleged need to care for his 93-year-

---

[2] https://www.linkedin.com/in/david-finkelson-5022629a/ (last visited Aug. 25, 2024).

old mother with dementia who nevertheless "lives independently," thus indicating that the defendant was not "irreplaceable." 2013 WL 12329917, at *2. Here, too, Finkelson has not adequately shown that he is irreplaceable for his mother's care given that she appears to live with some degree of autonomy and does not see Finkelson on a daily basis. *Leon*, 341 F.3d at 931; *see also United States v. Sweeting*, 213 F.3d 95, 107 (3d Cir. 2000) ("[A] family member's medical problems cannot be viewed in a vacuum; rather, courts considering whether to depart must weigh carefully, among other things, the severity of the condition and the degree of extra attention that it requires. . . . [W]e find it relevant to our ultimate determination that her son is able to attend school and participate in various sports activities with a large measure of success. These facts, which are uncontroverted by the parties, certainly undercut Sweeting's argument that her son's disorder presents her with extraordinary family responsibilities . . . .").

The cases cited by Finkelson in support of his argument do not help him. While the district court in the *United States v. Munoz-Nava* considered the fact that the defendant was the "primary caretaker and sole supporter of his eight-year-old son" and "the sole supporter of his ailing and elderly parents," in fact, the district court "did *not* grant the defendant's requests for downward departures based on extraordinary family circumstances." 524 F.3d 1137, 1142–43 (10th Cir. 2008) (emphasis added). Similarly, in *Gall v. United States*, while the government conceded in oral argument "that probation could be an appropriate sentence, given the exact same offense, if 'there are compelling family circumstances where individuals will be very badly hurt in the defendant's family if no one is available to take care of them,'" it was a hypothetical that was being discussed and the lack of a caregiver was not at issue in *Gall.* 552 U.S. 38, 59 (2007). In any event, here, there is no showing that Finkelson's mother has no other potential caregiver. Finally, in *United States v. Lehmann*, while the district court sentenced the defendant to probation based in part on its finding that incarcerating her would have a devastating effect on her son (who had symptoms of Asperger's disorder, attention deficit hyperactivity disorder, and post-traumatic stress disorder), the district court also found that alternative caregivers were inadequate for her son, and that the 3553(a) factors, including punishment, deterrence, incapacitation, and rehabilitation, did not support a term of imprisonment. 513 F.3d 805, 807–09 (8th Cir. 2008). Here, as noted, there is no showing that Finkelson's mother does not have other potential caregivers, and there

is indeed a need for punishment, deterrence, and rehabilitation.

Because Finkelson has not shown that he is an irreplaceable caregiver for his mother, a downward departure and home confinement are unwarranted.

### 2. Finkelson has not shown that his health issues are extraordinary or that the Bureau of Prisons is unable to provide him with necessary treatment.

With regard to Finkelson's own health issues, while the government is sympathetic and also wishes him well, he fails to show that a downward departure is warranted.

To receive a downward departure based on his physical and mental health, Finkelson must show that his conditions are extraordinary and that the Bureau of Prisons is inadequate to meet his needs. *See United States v. Piper*, No. 20-1867, 2021 WL 5088709, at *4 (6th Cir. Nov. 2, 2021) ("Because Piper's health conditions were not extraordinary, the district court did not err in failing to address the costs and efficiency of home confinement."); *United States v. Brooks*, 800 F. App'x 73, 76 (3d Cir. 2020) ("The District Court considered and reasonably rejected Brooks' arguments that his health complications related to his brain tumors and the symptoms of HIV made the conditions of confinement inhumane because there was no showing that the confinement would cause his condition to worsen nor that the Board [sic] of Prisons was unable to provide Brooks necessary medical care."); *United States v. Darji*, 609 F. App'x 320, 330 (6th Cir. 2015).

Finkelson's sentencing memorandum and accompanying exhibits list a number of disorders he has and medications he takes, and argues that he requires coordinated care. *See* Def.'s Mem. 5–6 & Exhs. A & E. For example, his primary care physician notes that he has "a multitude of health issues," including Type II diabetes, lower back pain, generalized anxiety disorder, "[l]eft shoulder issues," and depression. She also states that Finkelson is "under the care of multiple specialists" and "[h]is condition requires not only ongoing medication management but also multiple diagnostic tests, a proper diet, and personalized treatment plans." *Id.* Exh. A. Another physician notes that Finkelson currently takes seven medications daily. *Id.* Exh. E. Devoid from his brief, however, is any showing that his disorders are unusual or "extraordinary," or that the Bureau of Prisons is unable to provide the medications or care that he needs. Finkelson's own health issues therefore do not provide a basis for a downward departure, nor do they weigh in favor of home confinement as opposed to incarceration.

# CONCLUSION

In full consideration of the goals of sentencing and for the reasons stated herein, the government respectfully recommends that the Court sentence Finkelson to a term of imprisonment of **12 months**. Such a sentence is sufficient, but not greater than necessary, to vindicate the goals of Section 3553(a). The government also respectfully requests that the Court sentence Finkelson to 3 years of supervised release, and order that he pay restitution of $341,455 and a special assessment of $100.

Finally, the government respectfully requests that the Court permit a representative from SFHA to speak at sentencing, per SFHA's request.

DATED: August 26, 2024                     Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

　　/s/ Kevin Yeh
CHRISTIAAN H. HIGHSMITH
KEVIN YEH
Assistant United States Attorneys